IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 27, 2005 Session

## STATE OF TENNESSEE v. ADAM F. WESTER

**Direct Appeal from the Criminal Court for Anderson County**
**No. A2CR196A     James B. Scott, Jr., Judge**

_____

**No. E2004-02429-CCA-R3-CD - Filed February 9, 2006**

_____

An Anderson County Criminal Court jury convicted the appellant, Adam F. Wester, of first degree felony murder in the perpetration of aggravated child abuse, and the trial court sentenced him to life imprisonment. The appellant appeals, claiming (1) that the trial court erred by allowing the jury to hear about prior injuries to the victim; (2) that the trial court improperly admitted into evidence photographs of the victim's body; (3) that the trial court improperly instructed the jury on the mens rea element of the crime; (4) that the trial court erred by refusing to give a special jury instruction on "accident"; (5) that the trial court erred by giving sequential jury instructions; and (6) that the evidence is insufficient to support the conviction. Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

J. Thomas Marshall, Jr., Clinton, Tennessee, for the appellant, Adam F. Wester.

Paul G. Summers, Attorney General and Reporter; Blind Akrawi, Assistant Attorney General; James N. Ramsey, District Attorney General; and Janice G. Hicks, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

This case arose from the death of the appellant's six-month-old son, Bryson Wester. Amy Russell, the appellant's ex-wife, testified that she married the appellant in February 2001. At the time of the marriage, Russell had a six-year-old son, Aaron, and a three-year-old daughter, Alyssa. In June 2001, the victim was born. Russell worked about sixty hours per week as a licensed practical nurse and as a cashier at K-Mart. While Russell was working, her mother or the appellant took care of the victim.

On December 16, 2001, Russell was at home with the victim and bathed and fed him. That afternoon, Russell's parents arrived to take the victim to have his picture made with Santa Claus. Russell's mother brought an outfit for the victim to wear, and Russell and her mother dressed the victim in the outfit. Russell's parents left with the victim about 3:00 p.m. Sometime later, the appellant arrived home, and Russell went to work, leaving Aaron and Alyssa at home with the appellant. Russell returned home from work about 10:00 p.m. and found all of the lights turned on and Aaron and Alyssa asleep. The appellant and the victim were gone, and the victim's car seat was on the floor in the living room. The victim's clothes were on the floor in his bedroom, and a dark stain was on the mattress in his crib. About five minutes after Russell returned home, the appellant telephoned and told Russell that he had taken the victim to the emergency room. Russell telephoned her parents and told them that the appellant had taken the victim to the hospital. Shortly thereafter, Tammy Shepherd, a friend of Russell's mother, came to the home to stay with Aaron and Alyssa. Russell went to the Methodist Medical Center in Oak Ridge and learned that the victim had died. She said that she never hit the victim or threw him down, that his last physical examination was in October 2001, and that the victim was a normal, healthy baby. She said that there were no bruises on the victim when she bathed him earlier that day. Russell admitted that she pled nolo contendere to failure to report child abuse.

Alyssa Russell, who was five years old at the time of trial, testified that she and the victim shared a bedroom. On the evening of December 16, 2001, the appellant, Alyssa, and Aaron went to Burger King and Blockbuster video store. While they were gone, the victim was at home alone. After much leading by the State, Alyssa testified that sometime on the day of the victim's death, the victim was in his crib and started to cry. The appellant came into the room and told Alyssa to go to sleep. The victim was lying on his stomach, and Alyssa saw the appellant hit the victim on the victim's back, causing the victim to bounce up and down.

Aaron Scales, who was eight years old at the time of trial, testified that he was the victim's brother. On the night of December 16, 2001, he, Alyssa, and the appellant went to Burger King and Blockbuster video store. While they were gone, the victim was at home alone in his baby swing. When they returned home, the victim was crying, and the appellant picked up the victim and carried the victim to his room. Aaron and Alyssa watched a videotape in Aaron's bedroom, and Alyssa slept in Aaron's room that night. He said that they fell asleep during the movie, that he did not hear the victim cry, and that he did not know how the victim died.

Michael Berthiaume, a physician's assistant, testified that he was working at Methodist Medical Center on the night of December 16, 2001. The appellant came into the hospital carrying the victim and said, "[P]lease help me." The victim was not breathing, and Berthiaume started cardiopulmonary resuscitation (CPR), using two fingers to compress the victim's chest. The victim was wearing only a diaper, was wrapped in a blanket, and was cold. On cross-examination, Berthiaume testified that CPR could crush a child's chest, damage internal organs, or break ribs. He stated that the victim had "blotchy spots" on his chest and that the appellant sounded distraught.

Dr. Barry Cummings testified that on December 16, 2001, he was working at Methodist Medical Center. Michael Berthiaume yelled that he needed help, and Dr. Cummings went into the treatment room. The victim was lifeless and was not breathing. He stated that the victim was cold, which could have resulted from the victim's having been dead for a period of time or could have resulted from the victim's having been exposed to a cold environment. Dr. Cummings put an airway tube into the victim's lungs, and nurses used a bag and mask apparatus to get oxygen into the victim. A cardiac monitor revealed that the victim had a very slow, irregular heart rhythm but no pulse. Dr. Cummings tried to resuscitate the victim for about one hour. At some point, the victim had a slight return of cardiac activity, but the activity was lost. He stated that the victim had bruises across his chest and abdomen, a bruise under his chin, a few bruises on his back, and redness on one of his buttocks. He stated that he talked to the appellant and that the appellant told him the following: The appellant put the victim to bed about 6:00 p.m. and propped up a bottle in the crib with the victim. About 10:00 p.m., the appellant checked on the victim and discovered that the victim was not moving. The appellant tried to wake the victim, got no response, attempted CPR, and took the victim to the emergency room.

On cross-examination, Dr. Cummings testified that the appellant was upset and pacing. He said that if CPR was done incorrectly, it could cause broken ribs; a bruised heart; or a tear in the mesentery, the blood vessels that supply blood to the intestines. He stated that in order to do CPR on a baby properly, one or two fingers should be used to depress the chest and that the compressions should have a depth of one-half to one inch. He said that too much pressure could fracture the sternum and that a fractured sternum could injure the upper part of the abdomen. Dr. Cummings stated that some of the victim's bruises looked fresh and that some looked about twenty-four- to forty-eight-hours old.

Wanda Russell, Amy Russell's mother and the victim's grandmother, testified that on the afternoon of December 16, 2001, she and her husband took the victim to have his picture made with Santa Claus. They returned to Amy Russell's home about 5:30 p.m. The appellant was home, but Amy had gone to work. About 10:30 p.m., Amy telephoned her mother and was hysterical. Wanda Russell telephoned Tammy Shepherd and asked her to go to Amy's home. Mrs. Russell and her husband then went to the home and stayed there until Amy telephoned and told them that the victim had died. On cross-examination, Mrs. Russell testified that before she took the victim to have his picture made, she helped Amy change the victim's shirt and there were no bruises on the victim at that time. She said that on the afternoon of December 16, she noticed that a vein in the victim's neck was throbbing. She said that she did not remember telling a police officer that the victim had shallow breathing. She stated that the victim did not fuss or cry that afternoon.

Don Russell, Wanda Russell's husband, testified that on December 16, 2001, he and his wife took the victim to the mall in order to have the victim's picture made with Santa Claus. He stated that he never hit or threw the victim. On cross-examination, Russell testified that on the way to the mall, the victim appeared to have a breathing disorder. He stopped the car, but the victim seemed to be all right. Russell stated that before he and his wife took the victim to the mall, he held the

victim while his wife and Amy Russell changed the victim's clothes. He did not see any bruises on the victim.

Tammy Shepherd testified that she was Wanda Russell's friend. On the night of December 16, Wanda Russell telephoned and asked Shepherd to go to Amy Russell's house to watch Aaron and Alyssa while Amy went to the hospital. When Shepherd got to the house, Amy Russell was waiting for her on the porch. Shepherd stayed with Aaron and Alyssa, who were awake. Several hours later, the police arrived at the home.

Officer Kent Warren of the Oak Ridge Police Department testified that on December 16, 2001, he went to the Methodist Medical Center in response to a report that a child had died. When he arrived, he talked with Michael Berthiaume and examined the victim. Sergeant Scott Ball and Detective Ron Boucher arrived at the hospital, and Officer Warren went to Amy Russell's house to secure the scene. Tammy Shepherd and two children were at the home. Officer Warren inspected the victim's crib and took photographs.

Sergeant Scott Ball of the Oak Ridge Police Department testified that he was the Deputy Coroner for Anderson County. He said that he had been a deputy coroner for about fourteen years; that he attended the St. Louis School of Medicine, Medical, Legal, and Death Investigation Training Force; and that he took a master's course as follow-up to his initial training. On December 16, the Medical Examiner for Anderson County requested that Sergeant Ball go to the Methodist Medical Center. Sergeant Ball viewed the victim's body and saw three, crescent-shaped marks on the victim's head. Sergeant Ball then went to the victim's home.

Detective Ron Boucher of the Oak Ridge Police Department investigated the victim's death. On the night of December 16, Detective Boucher was paged and advised that a six-month-old child had died at the Methodist Medical Center emergency room. Detective Boucher went to the hospital, talked to Dr. Cummings, and viewed the victim, who was wearing only a diaper. Detective Boucher then went to the victim's home and inspected the victim's bedroom. Several days later, Detective Boucher and Sergeant Ball transported the victim's body to the medical examiner's office in Nashville and attended the victim's autopsy. On December 19, Detective Boucher interviewed the appellant and Amy Russell separately, and both gave a written statement. According to the appellant's written statement, the appellant gave the victim a bottle about 6:00 p.m. and then went to watch television. Aaron and Alyssa were watching television in another bedroom. About 9:30 p.m., the appellant checked on the victim and noticed that he was lying on his back and looked pale. The appellant picked up the victim and discovered that he was not breathing. The appellant put the victim on Alyssa's bed and began breathing into his mouth. The appellant "started pushing him hard on his stomach and sides and chest because I heard something in his throat." The appellant took the victim to the hospital. Detective Boucher stated that the appellant also gave an oral statement in which the appellant said that he checked on the victim, noticed that the victim was not breathing, and then picked up the victim.

Detective Boucher testified that after the appellant gave his written statement, he interviewed the appellant again and told the appellant that the victim had bruises, broken ribs, and a broken collarbone. The appellant gave another written statement. In the statement, the appellant said that about one month before the victim's death, he was carrying the victim to his room and slipped and fell. The victim "hit his face and some of my weight landed on him." The appellant also said that after Wanda Russell brought the victim home on December 16, the appellant was playing with the victim and "was throwing him up and down in front of his bed." The victim "hit my arm sideways and he hit the side of the bed and bounced into the bed." The appellant checked the victim, believed the victim was all right, and gave the victim a bottle. He then took Aaron and Alyssa to get something to eat and to the video store. About 9:30 p.m., the appellant checked on the victim. The victim was pale, and the appellant tried to give him CPR. The appellant rushed the victim to the hospital.

On cross-examination, Detective Boucher testified that he inspected the victim's room and examined the victim's crib but did not collect any evidence from the home. Wanda Russell told Detective Boucher that the victim had brittle bone disease and shallow breathing. Detective Boucher stated that the appellant told him that the appellant used his knuckles to give the victim CPR and that the appellant pressed on the victim's chest, stomach, and sides. He stated that the appellant was not a suspect on December 19, that he allowed the appellant to leave the police department after giving his statements, and that the appellant was not charged with a crime until June 2002.

The State recalled Amy Russell to testify. She stated that after she and the appellant left the police department on December 19, her mother drove them home. In the car, the appellant told Amy that he lied to the officers about throwing the victim into the air. According to the appellant, he told the story because the officers said they would harass Amy Russell and her children until he told the truth. Amy Russell stated that the appellant attended the viewing of the victim's body for five minutes and did not attend the victim's burial. On cross-examination, she acknowledged that the appellant acted like he loved the victim.

Dr. Bruce Levy, the Chief Medical Examiner for the State of Tennessee, testified that he performed the victim's autopsy. The victim had bruises on his neck, chest, abdomen, and back, and most of the bruises occurred at the time of the victim's death or within several hours before his death. One bruise was yellowish and looked to be older than the others. Dr. Levy x-rayed the victim's body and found that the victim had a fractured collarbone that was in the process of healing but was misaligned. The victim also had multiple rib fractures, and six to eight of the fractures were in the process of healing. He said that some of the rib fractures occurred at or near the time of the victim's death and that some of the fractures were several weeks old. Dr. Levy collected six hundred twenty-five milliliters of blood from the victim's abdomen and found a tear in the victim's abdominal mesentery. He explained that the mesentery is a fan-shaped piece of fat and tissue that connects the intestinal tract to the bloodstream. He said that the tear in the mesentery was three-eighths of an inch long and was beneath the victim's bellybutton. He said that one of the victim's rib fractures could not have caused the tear and that the tear resulted from a blow or crushing injury to the front of the victim's abdomen. He stated that a considerable amount of force had to be used

to cause the injury and that the tear was not the type of injury that would result from the normal handling of a child. He stated that he had never known CPR to cause such an injury.

Dr. Levy testified that he saw no indication that the victim suffered from brittle bone disease. He said that the victim suffered from battered child syndrome and that the victim's cause of death was blunt force injuries to the torso. He stated that the victim's rib fractures would have been painful and would have prevented the victim from rolling over. He stated that the bleeding caused by the mesentery tear would not have been rapid and acknowledged that the tear could have occurred as early as 7:00 p.m. On cross-examination, Dr. Levy testified that the victim's bruises occurred three to four hours before his death, and he acknowledged that some of the victim's rib fractures could have occurred two months before his death. He said that CPR could result in torn livers and rib fractures and that only fingers should be used to perform CPR on a small child, not knuckles. He stated that all of the victim's rib fractures were posterior and on either side of the victim's backbone and that CPR had never caused such posterior rib fractures. He said that some of the victim's rib fractures were fresh and occurred within six hours of the victim's death. On redirect examination, Dr. Levy testified that the appellant's hitting the victim on the back, causing the victim to bounce up and down, would be consistent with the victim's broken ribs and the bruising on the victim's back.

At Dr. Levy's request, Dr. Hugh Berryman, a biological anthropologist, examined the victim's ribs and right collarbone. Dr. Berryman stated that he found thirteen rib fractures that were at least two weeks old and eight fractures that occurred near the time of the victim's death. The jury convicted the appellant of first degree felony murder in the perpetration of aggravated child abuse, and the trial court sentenced him to life imprisonment.

## II. Analysis

### A. Admissibility of Prior Injuries

The appellant claims that the trial court erred by allowing the jury to hear evidence of the victim's prior rib fractures and broken collarbone. He contends that because the proof did not establish that he caused the prior injuries, they were irrelevant to any issue at trial and were inadmissible under Tennessee Rule of Evidence 404(b). The State claims that the evidence was admissible to show that the victim's death was not an accident. We conclude that the trial court did not err by admitting the evidence.

Tennessee Rule of Evidence 404 provides,

> (b) Other Crimes, Wrongs, or Acts.- Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). A trial court's decision regarding the admission of Rule 404(b) evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Luellen, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992). In making its decision regarding the admissibility of the testimony, the trial court must first determine if the offered testimony is relevant to prove something other than the appellant's character. If the evidence is relevant, then, upon request, the court will proceed to a Rule 404(b) hearing. See State v. Robert Wayne Herron, No. M2002-00951-CCA-R3-CD, 2003 WL 151201, at *2 (Tenn. Crim. App. at Nashville, Jan. 22, 2003) (stating that the admission of prior act testimony must also meet the test for relevancy contained in Tennessee Rule of Evidence 401), perm. to appeal denied, (Tenn. 2003).

Before trial, the appellant filed a motion in limine seeking to exclude evidence about the victim's prior injuries pursuant to Tennessee Rule of Evidence 404(b). At trial, the court held a jury out hearing in order to determine whether the evidence was admissible. During the hearing, Detective Boucher testified that when he confronted the appellant with the fact that the victim had old and recent rib fractures, the appellant gave a statement in which he said that about one month before the victim's death, he accidentally fell on the victim. The appellant also told Detective Boucher that on the afternoon of the victim's death, he was playing with the victim and was throwing the victim into the air. He explained that the victim hit the side of his crib and bounced into the bed. The trial court ruled that there was clear and convincing evidence as to the appellant's having dropped the victim, that the evidence was relevant, and that the evidence was admissible under Rule 404(b) to show that the victim's death was not an accident. The jury returned to the courtroom, and Detective Boucher testified about the victim's prior injuries and the appellant's written statements.

After this testimony, the trial court instructed the jury that it could only consider the evidence for the purpose of determining whether the victim's injuries on December 16 were accidental.

The facts in the instant case are similar to those in DuBose, 953 S.W.2d 649, 650-51. In DuBose, the sixteen-month-old victim died from a blow to his abdomen and resulting tears to the connective tissue of the small intestine. Id. at 651. The medical examiner testified that she found evidence of other internal injuries to the victim's abdominal area that were weeks to months old. Id. The defendant argued that the trial court erred by allowing the jury to hear about the prior abdominal injuries pursuant to Rule 404(b). Specifically, he argued that testimony about the prior injuries was irrelevant unless the injuries could be attributed to him. Id. at 653. Our supreme court held that because the "evidence admitted did not show the identity of the person who caused the prior abdominal injuries sustained by the victim, it was not inadmissible under Rule 404(b) as reflecting upon the character of the defendant." Id. The court concluded that evidence of the prior abdominal injuries was relevant to show that someone caused the injuries intentionally, not accidentally. Id. at 654; see also Tenn. R. Evid. 401. Moreover, the court concluded that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice as required for exclusion under Tennessee Rule of Evidence 403. Id.

Turning to the instant case, Dr. Levy testified that the victim suffered multiple rib fractures and a broken collarbone and that many of the fractures were more than two weeks old. Detective Boucher testified that when he confronted the appellant about the victim's prior injuries, the appellant offered a possible explanation, claiming that he accidentally fell on the victim about one month before the victim's death and that he accidentally dropped the victim on the afternoon of the victim's death. However, as noted in the appellant's brief, "[i]t is questionable as to whether the Defendant's responsibility for the earlier rib fractures was established by the proof," and there was no testimony as to whether the appellant's falling on or dropping the victim could have caused the victim's prior injuries. Therefore, like DuBose, the evidence was not inadmissible under 404(b). Moreover, evidence of the other injuries was relevant to show they were not the result of an accident, an essential element of aggravated child abuse. See Tenn. Code Ann. § 39-15-402(a)(1). The trial court obviously concluded that the probative value of this evidence outweighed the danger of unfair prejudice to the appellant. We agree and conclude that the trial court properly admitted the evidence.

## B. Admissibility of Photographs

The appellant claims that the trial court erred by admitting into evidence photographs of the victim's bruised body. He contends that the photographs "had no real probative value on whether Mr. Wester was perpetrating aggravated child abuse when Bryson died" and, therefore, that the photographs' prejudicial effect outweighed their probative value. The State claims that the photographs were admissible to show the circumstances of the offense. We conclude that the appellant waived this issue because he failed to object at trial. In any event, we conclude that the photographs were admissible.

During Detective Boucher's testimony, the State showed him exhibits 4.1 through 4.5, depicting the victim's injuries. According to the appellant's brief, he objected to the introduction of the photographs during Boucher's testimony. However, our review of the trial transcript reveals that the appellant failed to object to the introduction of the photographs. Therefore, the appellant has waived the issue. See Tenn. R. App. P. 36(a). We note that during Sergeant Scott Ball's testimony, the appellant objected to the introduction of exhibit 4.2 on the basis that the photograph was irrelevant under Tennessee Rule of Evidence 401. However, on appeal, he contends that the photographs were inadmissible under Tennessee Rule of Evidence 403. A "party cannot assert a new or different theory to support the objection in the motion for a new trial or in the appellate court." State v. Adkisson, 899 S.W.2d 626, 635 (Tenn. Crim. App. 1994). In any event, we have reviewed the photographs and conclude that they were admissible. Generally, "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." State v. Banks, 564 S.W.2d 947, 950-51 (Tenn. 1978). In the instant case, two of the photographs show bruises on the victim's chest and abdomen, one of the photographs shows bruises on the victim's back, one of the photographs shows crescent-shaped marks on the back of the victim's head, and the final photograph shows a red mark on the victim's buttock. The photographs are not gruesome or inflammatory and corroborate testimony regarding the extent of the victim's injuries. The photographs were properly admitted into evidence.

### C. Mens rea

The appellant claims that the trial court improperly instructed the jury on felony murder. Specifically, he contends that the trial court gave an improper instruction regarding the mens rea required to commit the underlying felony of aggravated child abuse. The State claims that the trial court properly instructed the jury. We agree with the State.

During the jury charge, the trial court instructed the jury as follows:

> First-degree murder. I charge you, the jury, that any person who commits murder is guilty of a crime. For you, the jury to find this defendant guilty of this offense the state must have proven beyond a reasonable doubt the existence of the following essential elements: number one, that the defendant unlawfully killed Bryson Wester; and two, that the killing was committed in the perpetration of or the attempt to perpetrate the alleged crime of aggravated child abuse. That is that the killing was closely connected to the alleged offense of aggravated child abuse or neglect; leave out neglect there in this case, Members of the Jury; and was not a separate distinct and independent event; and three, that the defendant intended to commit the less offense of aggravated child abuse.

The trial court then instructed the jury on aggravated child abuse. During jury deliberations, the jury sent out a written note, asking that the trial court "review and explain" element number three "that

the defendant intended to commit the alleged offense of aggravated child abuse." The trial court gave the jury the following written response:

> The elements that address the jury inquiry is that element of "knowingly". The law requires that a person commit "child abuse" other than by accidental means and commits the same "knowingly".
>
> The Court in providing you this further instruction directs the jury to the definition of "knowingly" and "accidental means".
>
> "Intentionally" means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.
>
> The requirement of "knowingly" is also established if it is shown that the defendant acted intentionally. The term "intentionally" has been previously defined for you in these instructions.
>
> These definitions alone with others presented in the charge are to direct your further deliberations.

In this case, the State was required to prove that the appellant killed the victim in the perpetration of aggravated child abuse. See Tenn. Code Ann. § 39-13-202(a)(2). "No culpable mental state is required for conviction . . . except the intent to commit [aggravated child abuse]." Tenn. Code Ann. § 39-13-202(b). Child abuse is the knowing treatment of a child in such a manner to inflict injury. Tenn. Code Ann. § 39-15-401(a). Aggravated child abuse is child abuse that results in serious bodily injury and is a Class A felony if the child is six years of age or less. Tenn. Code Ann. § 39-15-402(a)(1), (b). The "knowing" mens rea requirement for first degree murder in perpetration of aggravated child abuse refers only to the conduct element of treatment. State v. Ducker, 27 S.W.3d 889, 897 (Tenn. 2000).

The appellant claims that the trial court's answer to the jury was incorrect in that it allowed the jury to convict the appellant if the jury found that he committed aggravated child abuse knowingly, rather than intentionally. Thus, he contends that the trial court's instruction lessened the State's burden of proof. However, the trial court's original instruction to the jury was given in accordance with Tennessee Pattern Jury Instructions 7.03(b), the instruction for first degree murder, and 21.01, the instruction for aggravated child abuse. In the original instructions, the trial court specifically stated that in order to convict the appellant, the jury had to find that he intended to commit aggravated child abuse. The trial court then properly instructed the jury that aggravated child abuse occurs when a person knowingly, other than by accidental means, treats a child under six years old in such a manner as to inflict injury and the act resulted in serious bodily injury. In response to the jury's question, the trial court simply reiterated that the appellant had to commit aggravated child abuse "knowingly." The trial court then redefined "intentionally" and directed the jury to the original charge. We do not believe that the trial court's answer to the jury's question was an improper instruction or lessened the State's burden of proof.

D.  "Accident" Instruction

Next, the appellant claims that the trial court erred by refusing to give a requested instruction on "accident."  He contends that the trial court should have given the requested instruction because "accident" is used in the child abuse statute.  The State claims that although the trial court did not give the appellant's requested instruction, the trial court properly instructed the jury on "accidental means."  We believe that the trial court gave an erroneous instruction on "accidental means" but that the error was harmless.

A defendant has a "constitutional right to a correct and complete charge of the law."  State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990).  Accordingly, trial courts "should give a requested instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law."  State v. Phipps, 883 S.W.2d 138, 150 n.20 (Tenn. Crim. App. 1994).  However, trial courts need not give requested instructions if the substance of the instructions is covered in the general charge.  State v. Zirkle, 910 S.W.2d 874, 892 (Tenn. Crim. App. 1995).

Before trial, the appellant filed a motion requesting that the trial court charge the jury with the following instruction on accidental death taken from Harrell v. Minnesota Mut. Life Ins. Co., 937 S.W.2d 809, 814 (Tenn. 1996):

> [I]f death is the unanticipated and unexpected result of an intentional, voluntary act, it is accidental in the ordinary and plain sense of the word.

The trial court refused to give the requested instruction.  Instead, the trial court instructed the jury as follows:

> Accidental means.  Accidental means is a legal term provided in the definition of aggravated child abuse and child abuse.  In this case the law addresses the human agency, that is human acts, associated with aggravated child abuse and child abuse as these crimes relate to the cause of death as brought about by a knowing commission of aggravated child abuse.  A death of the child must be brought about by the personal acts of the defendant in the knowing commission of child abuse.

We conclude that the appellant's requested instruction, which the appellant took from a civil insurance case, is not a proper instruction in a first degree murder by aggravated child abuse case.  Thus, the trial court properly refused to give the instruction.  However, regarding the actual instruction on "accidental means" that the trial court gave the jury, we note that no instruction on "accidental means" appears in the Tennessee Pattern Jury Instructions and that the phrase is not defined by statute.  It is not clear where the trial court got the instruction that it gave the jury, and we believe the trial court's instruction was erroneous.  In our view, no instruction on "accidental

means" was necessary. See State v. Summers, 692 S.W.2d 439, 445 (Tenn. Crim. App. 1985) (stating that "[w]here words and terms are in common use and are such as can be understood by persons of ordinary intelligence, it is not necessary, in the absence of anything in the charge to obscure their meaning, for the court to define or explain them"). In any event, we hold that the trial court's error was harmless in light of the evidence against the appellant. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

## E. Sequential Jury Instructions

The appellant claims that the trial court erred by giving sequential jury instructions. He contends that it was error for the trial court to tell the jury not to consider lesser included offenses if it found the appellant guilty of first degree murder. However, he acknowledges that the issue has been previously and unsuccessfully litigated by other parties. The State claims that this court has repeatedly held that it is not error for a trial court to deliver sequential jury instructions. We agree with the State.

In the instant case, the trial court instructed the jury as to the lesser included offenses of first degree murder. The court also instructed the jury that it was to first consider the appellant's guilt on the indicted offense of first degree murder. If the jury found him guilty, they were to so indicate on the verdict forms and cease deliberation. However, if the jury found the appellant not guilty of first degree murder, the court instructed it to determine the appellant's guilt on the lesser included offense of second degree murder. If the jury found him guilty of second degree murder, it was to indicate the conviction on the verdict forms and cease deliberation. However, if the jury found the appellant not guilty of second degree murder, the jury was to determine the appellant's guilt on the lesser included offense of reckless homicide. The appellant argues that such sequential instructions were error.

This court previously examined this issue and determined that sequential instructions are proper. State v. Raines, 882 S.W.2d 376, 382 (Tenn. Crim. App. 1994). Our supreme court upheld this court's conclusion in State v. Mann, 959 S.W.2d 503, 521 (Tenn. 1997) (appendix). Therefore, we conclude that the trial court did not err by giving the sequential jury instructions.

## F. Sufficiency of the Evidence

Finally, the appellant claims that the evidence is insufficient to support the conviction. He contends that the evidence against him was circumstantial and that the State failed to prove that the appellant "actually caused the fatal injuries or inflicted any injuries with the culpable mental state required of a murderer." He argues that, according to Dr. Cummings' testimony, the appellant's performing CPR on the victim could have caused his fatal injuries. The State claims that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review is "whether, after viewing the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see Tenn. R. App. P. 13(e). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the jury as trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Moreover, we note that a guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

First degree murder is "[the] killing of another committed in the perpetration of or attempt to perpetrate any . . . aggravated child abuse." Tenn. Code Ann. § 39-13-202(a)(2). As previously stated, no culpable mental state is required for a first degree murder conviction except for the intent to cause the underlying felony. Tenn. Code Ann. § 39-13-202(b). Aggravated child abuse occurs when "[a] person . . . commits the offense of child abuse or neglect . . . and . . . [t]he act of abuse or neglect results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1). Child abuse and neglect occurs when "[a]ny person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare." Tenn. Code Ann. § 39-15-401(a).

The evidence at trial revealed that on the day of the victim's death, the victim's grandparents came to his home in order to take him to the mall and have his picture made. While at the home, the victim's grandmother and mother changed his clothes, and no one saw bruises on the victim at that time. That evening, the victim was in the appellant's exclusive care. About 9:30 p.m., the appellant took the victim to the emergency room because the victim was not breathing and had no pulse. Photographs of the victim show numerous bruises on his chest and abdomen and a few bruises on his back. The photographs also show crescent-shaped marks on the back of the victim's head. Dr. Bruce Levy found multiple, old and new rib fractures and a tear in the victim's mesentery, which caused extensive bleeding and death. The appellant told Dr. Cummings and the police that he had attempted CPR on the victim, and Dr. Cummings testified that CPR done improperly on a child could cause abdominal injuries. However, Dr. Levy testified that CPR could not have caused the victim's posterior rib fractures or the tear in the victim's mesentery. Instead, Dr. Levy concluded that blunt force to the victim's abdomen caused the tear. Moreover, Dr. Levy testified that most of the victim's bruises were fresh and that the mesentery tear could have occurred about 7:00 p.m., while the victim was in the appellant's care. The victim's sister testified that she saw the appellant hit the victim's back, causing the victim to bounce up and down, and Dr. Levy stated that these actions were consistent with the victim's rib fractures and bruises. When Detective Boucher confronted the appellant about the victim's injuries, the appellant explained that he accidentally fell on top of the victim about one month before the victim's death and that he accidentally dropped the

victim on the day of his death. However, the appellant also gave inconsistent statements to the police, claiming in his oral statement that he checked on the victim and saw that the victim was not breathing while claiming in his written statement that he picked up the victim and then discovered that he was not breathing. Taken in the light most favorable to the State, the evidence is sufficient to support the conviction.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE